VERNON (LAWRENCE v.). See Case No. 8,146.

VERNON (OLIVER v.). See Case No. 10,501.

VERNON COUNTY (McKEE v.). See Case No. 8,851.

VERNON COUNTY COURT (UNITED STATES ex rel. McKEE v.). See Case No. 14,877.

---

## Case No. 16,923.

### The VERONICA MADRE.

[10 Ben. 24.] [1]

District Court, S. D. New York. June, 1878.

SALE OF CARGO BY MASTER—CHARTER.

1. A bark sailed from Philadelphia with a cargo of corn, bound to Cork for orders. She met with heavy weather and put into Bermuda in distress, where, on the recommendation of surveyors, part of the cargo was discharged, being found to be heating, wet and damaged, and the vessel was repaired. While the cargo was being reloaded it was found to be again heating, and, a survey being called, the surveyors recommended that part of it be again discharged and cooled. While this was being done the master went to Philadelphia and informed the underwriters and the shipper of the corn of the situation of affairs. Neither the underwriters nor the shipper gave him any instructions. The latter told him they had sold the corn to a London house whose name they gave to the interpreter who accompanied him, he being an Italian and speaking no English. The master sent no information to the London house, but returned to Bermuda. After

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

his return to Bermuda another survey was held, which reported the corn, as well that which was discharged as some 8,500 bushels still on board, as being unfit to proceed on the voyage to Europe, and therefore recommended its sale. Previous to the sale the master made an agreement with one Gray, by which if Gray bought 10,000 bushels of the corn the master was to carry it to New York, free of freight, but was to have half the profit arising on its sale in New York. The cargo was sold and Gray bought 11,000 bushels, including the 8,500 bushels which had never been discharged from the vessel, and the master carried it in the bark to New York. The master acted in what he did with the knowledge and concurrence of the agent of the underwriters. The corn which was carried to New York arrived there in good shipping condition for Europe. It was sold there for four times what Gray paid for it, but for about 6 cents a bushel less than sound corn, and was immediately shipped to Europe by the purchaser. The London house, which had purchased the cargo from the shipper, filed a libel against the vessel for breach of the charter party under which the cargo had been shipped, in that the vessel had not proceeded to Cork for orders with the cargo. The owners of the vessel set up as a defence that the voyage nad been broken up by perils of the sea, and the condition of the cargo. *Held*, that the agreement made by the master with Gray was one which should subject his acts and motives to the closest scrutiny and throw upon him the burden of showing that it was made in entire good faith.

2. The facts attending the condition and sale of the cargo in New York were not sufficient to overthrow the evidence that, when it was sold in Bermuda, it was not in a condition to be carried forward to Europe.

3. The master was not bound under the circumstances of the case to have communicated with the owners of the cargo before selling.

4. He was not authorized to bring the cargo to New York for account of its owners.

5. The sale of the cargo by the master was justified under the circumstances, and that the libel must be dismissed.

Blatchford, Seward, Griswold & Da Costa (R. D. Benedict, of counsel), for libellants.

Coudert Brothers, for claimants.

CHOATE, District Judge. This is a libel filed by John Walker and others, owners of the cargo of the Italian bark Veronica Madre, for damages occasioned by breach of charter party. On the 24th of September, 1877, in London, the bark, which was then at Naples, was chartered to the libellants to proceed to Philadelphia, and thence with a full cargo of wheat or corn, for a voyage to Cork or Falmouth, for orders. The bark arrived at Philadelphia and took on board her cargo, about 29,000 bushels of Indian corn, and on the 28th day of December, 1877, set sail on her voyage to Cork, for orders, according to the charter party. The breach of the charter party relied on by the libellants is, that the bark did not proceed on her voyage to Cork or Falmouth for orders, and that the master has failed and refused to deliver the cargo to the libellants and has converted the same to his own use. The defence set up by the master, in his answer on behalf of the owners of the bark, is, that his bark being disabled by the perils of the sea, on the voyage, he put into the port of St. Georges, Bermuda, in distress, and there his cargo was sold from necessity, being wholly unfit to be carried on the voyage, and in a decaying condition.

The testimony shows that while the bark was proceeding on her voyage, on the 3rd or 4th of January, 1878, she met with gales and heavy seas, in consequence of which her cargo shifted, she was thrown on her beam ends, her stanchions were started, and her pumps choked with corn. After throwing over some spare sails and other things belonging to the bark, and a part of the corn, and throwing the corn over from the port to the starboard side, the master found it impossible to right the vessel, or to make the pumps work, so as to keep her clear of water. And the vessel taking some water, and the cargo being wet, the master, after taking the advice of his crew, concluded to put into Bermuda, then about three hundred miles distant, and the nearest port he could make, with the wind then blowing and his vessel listed over. He arrived at Bermuda on the 9th of January, and on the 11th of January a survey was ordered by the Italian vice-consul, to be made by three competent persons, under whose advice the cargo was partly discharged, in order that the vessel might be repaired. On the 19th of January, another survey of two competent persons was called to examine the cargo. They visited the vessel and the warehouse in which the part of the cargo that had been discharged was stored, at various times between the 19th and the 29th of January, and reported that much of the corn in the vessel on both sides was damaged, evidently by sea-water, that it was black and decaying, and much of the corn on the floor of the vessel amidships was also heated. They recommended that every precaution be taken to separate the decaying from the heated corn and both from the uninjured, during the discharge of the cargo; and they also reported that every precaution was being taken in the warehouse to separate the heated from the uninjured corn, and they finally recommended that the decaying corn, estimated at 4,000 bushels, be immediately sold at auction, and that the heated corn be properly aired and handled to expedite its cooling, and that what remained in the vessel be relanded.

The evidence shows that the recommendations of the surveyors were faithfully carried out. So far as could be done, the decaying corn was separated from that which appeared to be sound, and such appliances were availed of as were practicable in the port to cool and preserve that part of the cargo which was thought capable of being saved and reshipped. And, the vessel having been repaired and the corn that was left being apparently cooled and fit to be reshipped, the master commenced reloading the vessel. When the corn had been nearly all reloaded, there came on rainy weather and the hatches had to be closed for three days. On removing the hatches on the fourth day, the corn in the vessel was found to be very hot and steaming. Thereupon a survey was called and the same surveyors, who had examined the cargo before, reported on the 20th

of February that the greater part of the cargo had been shipped and that they found it in a very heated condition, fermenting and smoking, while that which remained in the warehouse was in apparently good condition; and they recommended that the cargo be immediately unloaded and cooled with the view of saving it for the interest of whom it may concern.

On the same day, Feb. 20, another survey was made by the resident agent of United States underwriters and by one Ellis, who is described as the "special agent of New York," and who is shown by other evidence to be the agent of New York underwriters. They reported that they found the corn to be in a very heated condition, undergoing fermentation, and they advised that the interest of those concerned would be consulted by its reshipment to the United States as speedily as possible, as the market in Bermuda was already glutted with a similar article.

Immediately after this the master came to New York by steamer to consult the shippers of the cargo and the underwriters, leaving directions for the discharge of the cargo into the warehouse during his absence. He went to Philadelphia, and with an interpreter called on the firm of Waln & Co., who shipped the corn. The master is an Italian, and understands very little English. The president of the insurance company that had insured the cargo refused to give any instructions about the matter, stating that they were liable only for a total loss. The shippers at Philadelphia told him that they had nothing to do with the corn, that it was sold to a London house, and they gave the name of the libellants as the owners. This was understood by the interpreter, but seems not to have been understood by the master. They told him that they would look up their telegraphic code, and if they could find a short way of telegraphing, they would telegraph the libellants. Not finding any such, they told him that he might telegraph, which, however, he did not do. On the 27th of February, he wrote a letter to Waln & Co., giving a full and truthful account of what had happened up to the time he left Bermuda, and he sent with it copies of one or more of the surveys that had been taken. Waln & Co. were in constant communication with the libellants, and acted for them in the shipment of this cargo. They had received notice before the master's arrival that the vessel had put into Bermuda in distress; and within a few days after receiving this information, Waln & Co. wrote to the libellants at London, giving them the same information, and the libellants replied, but gave no special instructions as to the matter. The master then returned by steamer to Bermuda, having been absent from there fourteen days or less. The discharging of the cargo was still going on when he arrived.

On the 5th of March, another survey was appointed by the Italian vice-consul. The surveyors were the American consul, and the special agent of the New York underwriters, Mr. Ellis, and they reported that about one-third of the cargo was still in the vessel, that this portion they found extremely hot, sweating very badly, and very musty. As to the other portions of the cargo spread out in the stores they reported that notwithstanding the stores were very large and thoroughly ventilated, the corn was in a similar condition to that which was in the hold of the vessel; that superficially the corn was comparatively cool, but a very few inches below the surface it was extremely hot, sweating and musty; that when pressed by the hand, the grains became adhesive one to the other, and that it was very hot and clammy; that this was the prevailing condition of the entire lot. They added: "We are therefore decidedly of opinion that this cargo is not by any means in a fit condition to be reshipped for Europe, and we do not believe that it could be rendered in a fit condition for such reshipment." They also say that the stores in which it was spread were not sufficiently large to admit of the entire cargo being spread and cooled; and they recommended that portions be sold from the stores at judicious intervals of time to furnish space for that which was then excessively hot on board the vessel, and that, after that portion had been discharged and spread for cooling, it also should be sold for benefit of all concerned, and then concluded their report as follows: "We cannot express too emphatically our opinion of the decided unfitness of the cargo for reshipment for Europe."

About 3,000 bushels more were afterwards discharged from the vessel, leaving still in her about 8,500 bushels. The sales of the corn at auction under the recommendation of the report of this survey commenced on the 9th of March, on which day 1240 bushels were sold at prices varying from 17 cents to 23 cents per bushel. On the 14th of March 2000 bushels were sold, on the 20th of March 1100 bushels, and on the 28th of March the rest of the cargo, including what remained on the vessel, in all about 17,000 bushels. Of the corn so sold, one Gray bought 11,000 bushels at 12½ cents a bushel. It included what remained in the vessel.

Besides the evidence of these surveys there was evidence of several witnesses who saw the corn in Bermuda, both that in the vessel and that in store, which strongly corroborates the statements of the surveyors, that the corn was very much heated, discolored, undergoing fermentation, and that it was not in a fit condition to be shipped on a voyage to Europe, and that the master did all that could be done down to the time of the reloading of the cargo and after its discharge a second time, to cool and save it. It also appeared that the sales were extensively advertised and numerously attended. Much of the corn was bought in small lots, and one of the purchasers was examined, by whom it appeared that his pigs, fowls and horses refused to eat the corn.

Thus far the evidence is entirely satisfactory that the cargo was in such a condition that it could not be carried forward on the voyage with safety, and that, if carried for-

ward, it would in all probability become worthless; and as to the bulk of the cargo, that it could not, so far as could be foreseen by the master at the time, be made fit by the use of any means at hand to be carried forward; that it was in fact in a state of fermentation and decay.

But the libellants rely especially on the evidence of the condition of a part of the corn, after its arrival in New York, in the bark, as showing that the cargo was not in so bad a condition as represented in the surveys, and by the Bermuda witnesses, and that the sale was not necessary, nor made in good faith. The bark arrived at New York about the 20th of April. She had on board about 11,000 bushels of the corn shipped by Gray. The account which the master and the witnesses for the claimants give of the matter, is as follows: After it was determined to sell the cargo, the master inquired for ballast and found that it would cost him about $400 to get ballast for his vessel. It was then suggested by Mr. Ellis, with whom he consulted on the subject, that Mr. Gray might be induced to buy a part of the cargo, and that it could be taken to New York as ballast and the bark might get some freight for carrying it. Gray wrote the master a letter, asking on what terms he would take a part of the corn to New York, if he should buy it. This led to the making of an agreement in writing between the master and Gray, under the advice of Ellis and others whom the master consulted. The agreement is dated the 19th of March, and is to the effect that if Gray should buy 10,000 bushels or more of the corn at a price not to exceed 12 cents a bushel, it should be carried in the bark to New York, "there to be sold to the best advantage, and on the following conditions," the master to deliver it in New York "without any charge of freight," "but shall receive instead of freight one-half of the profit arising from the sale thereof, after deducting out thereof the cost at auction, the expenses of putting it aboard and delivering and selling it at New York," and Gray was to bear any loss on the transaction.

Under this agreement the corn was brought to New York and soon after its arrival was sold at 50 cents a bushel, and witnesses have been examined as to its condition and value on its arrival. The evidence clearly shows that the corn was sold at about ten cents above its market price here; that the corn having been through a process of fermentation, is unfit for use as food for man or animals; that the purpose for which such corn is bought in this market is for making whiskey and that it is shipped from this port to ports in the Mediterranean for that purpose. But the evidence also shows, that the corn when it arrived here was almost entirely cooled off; that the process of fermentation through which it had gone was arrested, and that though a very bad lot of corn of its kind, that is, damaged corn, it was worth in this market about 40 cents a

bushel, sound corn being worth 56 cents a bushel. The purchaser of the corn here immediately shipped it, mixed with other corn, to Naples.

This evidence is not sufficient to overcome the great weight of the testimony, which shows, that when the sale of this cargo was determined upon, it was in the condition certified to by the surveyors and that it was then apparently fermenting and decaying; nor does it show that in the circumstances in which it then was and with the information that the master could then obtain, the sale of the cargo at Bermuda was not a wise and prudent course for the master to take. The fact that the corn brought ten cents more than it was worth, was a lucky accident for Gray, the purchaser. The fact that it arrived in New York in better condition than it was in on leaving Bermuda, that it was worth forty cents a bushel here in the condition in which it in fact arrived, were facts which it cannot be held that the master should have foreseen, and it is evident that no such thing was expected as probable by those who saw the corn in Bermuda.

The agreement between the master and Mr. Gray is one which should subject the acts and the motives of the master in making it to the most rigid scrutiny. It throws on him a very heavy burden of showing that it was made in entire good faith towards the owner of the cargo, but the circumstances and the evidence do satisfactorily show that he acted in entire good faith. The facts testified to, as to the difficulty and expense of getting ballast at Bermuda, are not controverted. All his acts from beginning to end were open and without any attempt at concealment. His efforts to save the cargo and to get proper advice as to his duty were throughout constant. There is no reason for believing that Mr. Ellis had any interest in the matter of promoting the sale to Gray, except to aid the master in his difficulty, and he was certainly a competent and proper person for the master to consult. He advised this course, and by his intervention secured a purchaser for the remnant of the cargo, which it might have been very difficult to sell, and at the same time secured for the master a chance to ballast his vessel without expense and possibly to earn some freight.

Nor does the fact that 11,000 bushels of the corn came safely to New York, and cooled on the voyage, with the aid of the means used by the master, as he testifies, for that purpose, show that the cargo or any substantial part of it could have been safely carried to Europe, still less that in the situation of affairs at Bermuda such a possibility should have been foreseen.

It is urged, that the master should have brought the corn to New York for account of the owner of the cargo instead of selling it. But what authority had he to do so? As the agent of the owner, he was bound to act with the intelligence and care which a prudent owner would exercise if present, but this rule is

necessarily subject to the limitation that he must still act, and could only act, within the limits of his agency. He could not, as the owner could, if present, take new risks and enter on new speculations, not within the scope of his employment, and such would be the shipping of the corn to another distant market, at least unless such were obviously the only way in which the corn or its value could be saved to the owner.

It is suggested that the master, before selling, should have communicated with the owners for instructions. But under all the circumstances and in the urgent situation in which the condition of the cargo put him, and after his attempt at Philadelphia to do so, I think he is not chargeable with fault in this respect.

On the whole case, therefore, while the rule that the master, to justify a sale of the cargo must show a "moral necessity" for the sale, and must also show that he acted in perfect good faith, should be firmly adhered to in the interests of commerce, that rule is not infringed nor impaired in this case by holding the master justified in his acts by the proofs.

The libel must be dismissed, with costs.